Filed 12/1/23  In re J.D. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re D.J., a Person Coming Under Juvenile Court Law. | B319125 |
| | (Los Angeles County Super. Ct. No. 20CCJP04948) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| D.W., | |
| Defendant and Appellant. | |

APPEAL from order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

James W. Haworth, under appointment by the Court of Appeal, for Defendant and Appellant D.W.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

_____

In early 2021, after the juvenile court sustained a petition filed by the Los Angeles County Department of Children and Family Services (DCFS) on behalf of D.J. (born September 2020), it bypassed reunification services for appellant-father D.W. under Welfare and Institutions Code section 361.5, subdivision (b)(10) (section 361.5(b)(10)).[1]  Father did not appeal the denial of reunification services.  Instead, in January 2022, he filed a petition under section 388, asking the court to change the order denying him reunification services.  The court denied the petition, finding Father had failed to demonstrate both that circumstances had changed since the previous order issued and that granting the petition was in D.J.'s best interests.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.  Section 361.5(b)(10) permits the court to bypass reunification services for a parent of a child on whose behalf a petition was filed if "the court ordered termination of reunification services for any siblings . . . of the child because the parent or guardian failed to reunify with the sibling . . . after the sibling . . . had been removed from that parent . . . and that parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling . . . ."  The court had previously terminated reunification services for Father in a case involving D.J.'s siblings.

On appeal, Father contends the juvenile court abused its discretion because it: (a) failed to consider the alleged impropriety of its previous order denying him reunification services when it found he failed to demonstrate changed circumstances; and (b) found that granting the petition was not in D.J.'s best interests. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. *The Parents Lose Custody of D.J.'s Siblings*

In April 2016, the juvenile court found jurisdiction over two of D.J.'s siblings under section 300, subdivision (b)(1). Specifically, the court found that D.J.'s mother[3] and Father had a history of domestic violence, that Mother had a history of substance abuse and was a current abuser of alcohol, and that Father failed to protect the children from Mother's alcohol and substance abuse. The parents were provided with reunification services but failed to reunify, and the court terminated jurisdiction in October 2017, granting the paternal grandmother legal guardianship over the siblings.

### B. *DCFS Files a Petition on D.J.'s Behalf*

In September 2020, one day after Mother gave birth to D.J., DCFS was notified that Mother had tested positive for cocaine. A children's social worker (CSW) spoke with hospital staff and learned that D.J. had also tested positive for cocaine.

---

[2] We limit our summary to the facts and procedural history relevant to the issues appellant raises on appeal.

[3] Mother is not a party to this appeal.

3

The CSW spoke with Mother, who admitted to smoking cocaine four days before she gave birth "because she was upset at father for questioning [whether] he is the father of the baby." She stated she had begun smoking cocaine two or three years ago and smoked every other day. She denied using other drugs or drinking alcohol. Mother agreed to participate in an inpatient drug treatment program and to drug test on demand. Mother informed the CSW that Father also smoked cocaine, and that they sometimes smoked together, but had not done so when she was pregnant. Mother claimed Father had told her not to use drugs, and did not know she was doing so when pregnant.

Father echoed Mother's claim that he did not know she was using cocaine during her pregnancy, but also stated "he sort of knew that the mother was using drugs because of her actions." However, when he confronted her, she denied it. Father claimed that he occasionally drank alcohol but denied any history of drug use. After being informed that Mother had already told the CSW he used drugs, Father admitted to using cocaine, and said that he had last smoked a week ago. He stated he began smoking cocaine in 2017 or 2018 and smoked once or twice a week. He also stated he smoked marijuana "every blue moon." Father agreed to participate in an outpatient drug treatment program but stated he could not do an inpatient program because he did not want to lose his job or his apartment.

Both parents agreed to a safety plan in which Mother and D.J. would temporarily stay with a maternal aunt, and Mother would not be left alone with D.J. Mother also agreed to contact drug treatment programs "first thing in the morning." The maternal aunt agreed that the parents were not to be left

4

unsupervised with D.J. and that she would not let the parents leave the home with D.J. without her.

A week later, DCFS learned that Mother had left the maternal aunt's house with D.J. and entered an inpatient drug treatment program. Father had yet to enroll in a program; he did not think he had a substance abuse problem but agreed to enroll if it meant D.J. could be in his care. DCFS sought and was granted an order removing D.J. from the parents, and the removal was carried out that same day. D.J. appeared to be showing withdrawal symptoms due to being prenatally exposed to cocaine.

Four days later, DCFS filed a petition under section 300, subdivisions (b)(1) and (j). Count b-1 alleged D.J. tested positive for cocaine at birth. Counts b-2 and j-1 identically alleged that Mother had a history of alcohol abuse and was a current abuser of cocaine—the counts alleged she tested positive for cocaine both one day before and two days after D.J.'s birth—rendering her incapable of providing regular care and supervision to D.J. The counts also alleged D.J.'s two siblings were former dependents of the juvenile court due to Mother's drug abuse and both received permanent placement services. Count b-3 alleged Father was an abuser of alcohol and cocaine—the count alleged Father tested positive for cocaine one day after D.J. was born—rendering him incapable of providing regular care and supervision to D.J. Count b-4 alleged Mother suffered from mental and emotional problems, rendering her incapable of providing regular care and supervision for D.J.

5

Mother appeared at the detention hearing and entered a general denial; Father did not appear.[4] The court found a prima facie case to detain D.J., and ordered monitored visits of at least six hours per week for the parents. Two weeks later, Father was arraigned and entered a general denial. The court confirmed the parents were granted monitored visits.

### C. *DCFS Investigates*

D.J. appeared to be doing well in the home of his caregiver, although he still exhibited signs of drug withdrawal. The caregiver reported that she facilitated video calls with the parents upon their request, "but this was infrequent."

In conversations with the Multidisciplinary Assessment Team in October 2020, Father "expressed the need to separate from [Mother] and old friends/acquaintances, to avoid being tempted, falling back into unhealthy relationships . . . and engaging in drug use." In speaking with a dependency investigator (DI) in December 2020, Father admitted that, contrary to his previously professed ignorance about Mother's drug use during pregnancy, he had used drugs with Mother when she was pregnant but explained he "didn't think it was going to cause this much harm." He also claimed that, although he and Mother had told the DI in a call four days earlier that they were in a relationship, the reality was that they were not, and were

_____

[4] While the detention report noted that DCFS had informed Mother of the detention hearing, it contained no such statement regarding Father. Additionally, it was discovered at the hearing that the attorney tasked with calling Father had transposed two digits of his phone number, and thus had been unable to reach him.

"just living together."  Father asserted that he was "doing what I need to do, but she's not."  Father said he was attending an outpatient drug treatment program and had been sober for two weeks.  He professed to be motivated by regaining custody of both D.J. and the two children previously removed from him.  Out of eight drug tests scheduled for Father, he tested negative five times, and missed three tests.

In conversations with the DI in December 2020, Mother also admitted that, contrary to what she had stated to the CSW, she had used cocaine with Father during her pregnancy.  She claimed she had been sober for two weeks, but informed the DI that she had left her inpatient drug treatment program because "[t]hey were acting racist toward me."[5]  She acknowledged the need to find another inpatient program to regain custody of D.J.  Mother admitted she had left a previous drug treatment program—attended when she was trying to reunify with D.J.'s siblings—because she "said I don't want to do it."  Mother acknowledged that when the court took jurisdiction of D.J.'s siblings, she was an alcoholic, but she insisted that the children had been well cared for nevertheless.  She denied any physical altercations with Father despite the previously sustained petition finding otherwise.  Mother said she understood that she needed to drug test, and knew how to do so, but "I just don't go."  She also explained that she had been diagnosed with "Paranoid Schizophrenia and Bipolar" and had been prescribed Seroquel and two other medications.  Mother stated she had taken her medications until she became pregnant, and then stopped at her

---

[5] When asked to elaborate, she stated that "[e]verybody was Mexican, nobody was Black.  Everybody was talking Spanish, nobody talked English."

doctor's recommendation. She had not resumed taking her medications and was not currently being treated for her mental health issues.

The parents were scheduled to visit D.J. three times in October 2020, for two-hour visits. On the first visit, Mother "was reportedly not engaged with the child, and appeared inattentive and frustrated with him at times." "Halfway through the visit, the parents put the child in his car seat and prepared to leave." After being reminded that their visit was not over, they "waited" and "Mother continued to repeatedly ask how much time was left." On the second visit, the parents were 45 minutes late. On the third visit, the parents did not appear and, when reached by telephone, Father stated he would not be coming. In November 2020, D.J.'s caregiver reported that each time D.J. returned from visiting his parents, "he has an outbreak of oral thrush."

### D.    *The Court Bypasses Reunification Services*

In the February 2021 adjudication hearing, the court sustained the petition as to both parents. In March 2021, when attempting to get in touch with Mother, the DI spoke with Father; Father stated Mother "comes and goes" from his apartment, and that he saw her regularly. He also told the DI that the best way for the DI to reach Mother was to leave a message with him.

In the March 2021 disposition hearing, counsel for DCFS asked the court to bypass reunification services for both parents under section 361.5(b)(10). D.J.'s counsel agreed with the request. Father's counsel stated that he was "asking the court to use its discretion to provide [Father] with reunification services" and that if the court were not inclined to do so, "that will be over Father's objection." Mother's counsel also asked the court not to

8

deny reunification services, discussing Mother's efforts at addressing the issues bringing her before the court, and pointing out that the current sustained petition contained a mental health allegation absent from the previous sustained petition, which differentiated the cases.

After confirming with counsel for DCFS and counsel for D.J. that their recommendations remain unchanged, the court removed D.J. from the parents and found that "the factual predicates of Welfare and Institutions Code section 361.5(b)(10) ha[ve] been established with respect to [Father] as well as [Mother], and on that basis [the court] is denying reunification services." The court specifically found that Father "has not made reasonable efforts to address [the issues that gave rise to the previous children being removed from him], which are largely identical to the issues in the sustained petition." The court ordered DCFS to provide permanent placement services for D.J.

### E.    *Father Requests Reunification Services*

In a July 2021 report, DCFS recommended that D.J. be adopted by his current caregiver. In September 2021, the court ordered adoption to be the permanent plan for D.J.

In a January 2022 report, DCFS noted Father had contacted a CSW on July 7, August 3, September 7, and November 5, 2021 to arrange a visit with D.J. "but does not follow up for [the] visit." The caregiver reported that Father "has had a total of 6 virtual visits and if she arranges a time for father to call[,] he does not call or he calls late at night."

Also in January 2022, Father filed a section 388 petition for the court to "[o]rder return [of D.J.] or in the alternative[,] family reunification services for Father." Father contended that: (a) it was improper to deny him reunification services under section

9

361.5(b)(10) because the previous dependency case in which he failed to reunify with D.J.'s siblings had to do with domestic violence and the current case had to do with substance abuse; and (b) despite the court's denial of reunification services, Father had completed a 12-week parenting program and a 6-month substance disorder program and participated in individual counseling, gaining insights from those activities.[6]

As to why the requested order would be in D.J.'s best interests, Father claimed that while he had been unable to visit D.J. in person since October 2020 both due to COVID-19 and DCFS's inability to provide a monitor, Father engaged in video calls with D.J. twice or thrice weekly for 30 minutes. Father claimed that D.J. was excited when he saw Father on the video call and would smile and laugh. Father concluded that he and his son shared a bond, and it would be detrimental to D.J. if it were severed.

Father attached to his petition a March 2021 certificate of completion for a substance use disorder program and an April 2021 certificate of completion for a parenting program. He also attached a March 2021 "Progress Letter," attesting to his participation in weekly "Individual Counseling" sessions as well as "28 groups," "21 individual sessions with Primary Counselors

_____

[6] Specifically, Father stated he learned the importance of paying attention to and providing for his child's needs, how to communicate with children, and that corporal punishment is wrong. He also learned that he was not alone in his struggle to be sober, learned coping strategies to aid in sobriety, gained understanding on how substance abuse affected his parenting both by preventing him from being an attentive father and by setting a bad example, and learned the importance of being sober to be a good father.

10

as well as 9 case management sessions."[7]  The letter stated Father had "U[rine] A[nalysis] negative test result[s] for the months of: November, December, January. And February 2021 (5 panel) [*sic*]" and that, during the six months of treatment, "we have observed [Father] grow and mature into a responsible citizen in multiple areas in his life."  The court set a hearing date in March 2022 for Father's petition.

DCFS attempted to contact the program that Father attended to obtain more details but, beyond confirming Father's attendance and completion, as well as his participation in individual counseling, the program refused to provide further information.  The program manager additionally noted that Father had completed the program "a year ago," so he would "need new consents from both of you prior to providing any additional information."

DCFS spoke with D.J.'s caregiver, who "expressed concern that [D.J.]'s parents have not made an effort to visit or engage with the child in person, or via telephone.  She estimated that[,] at the very most, father has participated in 10 video/phone calls with D.J. since he was placed in her home," even though Father knew that "at 7pm any day he can call except for Friday[]s when I take the kids out."  The caregiver described Father's tendency to send her a text message asking to speak with D.J., her consent for him to do so, and his failure to follow through.  The caregiver stated that Father "always goes months without calling" and when asked about it, he would respond, " 'I be falling asleep[,] that's why I don't call.' "  The caregiver stated Father did not call

---

[7] It is unclear from the letter whether the weekly "Individual Counseling" was the same as the "21 individual sessions with Primary Counselors."

11

on D.J.'s birthday or during "any holiday that people call their kids." Additionally, the caregiver claimed that when Father did call, D.J. was not interested. The caregiver also noted that when Father called, he was often with "mom and other people." The caregiver reported that Father "does not have age appropriate expectations of the child" and "does not interact with him appropriately." She gave an example of a recent call in which Father said to D.J., " 'Why are you grabbing on that woman's titties, son?' " and " 'Yeah, your mom, she's back there on drugs. I haven't had none in a couple months. I don't know what she's gonna do, son. She doesn't even want to talk to you.' "

DCFS spoke with Father, who claimed he had video calls with D.J. at 7:00 p.m. on Thursdays, Fridays, and one weekend day. When asked about the discrepancy between his account of the frequency of his contact with D.J. and the caregiver's report, "Father admitted that he does fall asleep at times before his visitation."

Regarding sobriety, Father explained that after he lost custody of his children in the previous dependency case, he "went down the wrong path with drugs," but has since learned he has to "leave the baby mama to the side" to stay sober. He claimed that he had not been in contact with Mother for six months, that he attended two 12-step meetings a month, and that he checked in with his former therapist as needed. DCFS asked Father to contact his therapist to provide consent for the therapist to release a certificate or letter of completion regarding individual counseling or any additional programs.[8] When asked why Father

_____

[8] The record does not reflect whether Father did so, but no certificate or letter of completion—other than what was in Father's initial application—appears in the record.

12

took so long to file his section 388 petition, Father said he did not know, and that he had provided the paperwork to his attorney immediately upon completion of the programs.

DCFS opposed Father's petition, citing the lack of details regarding Father's participation in individual counseling, Father's continued association with Mother, and Father's apparent ignorance of "developmentally appropriate parenting" and "an understanding of his child's unique needs." DCFS also argued that granting the request would not be in D.J.'s best interests, citing both Father's infrequent attempts at contacting D.J. and D.J.'s lack of interest in interacting with him.

At the hearing on Father's request, Father's counsel reiterated the arguments made in Father's petition, adding that Father had been approved for a housing program that would allow D.J. to reside with him if he were successful in reunifying, and pointing out that Father had stable employment. Father's counsel added that Father was "committed" to learning how to address D.J.'s needs through whatever means DCFS recommended. D.J.'s counsel reminded the court that the period to appeal the denial of reunification services had passed. D.J.'s counsel also pointed out that, "the most important component of a family reunification plan is visitation" and Father had failed to physically visit D.J. or familiarize himself with D.J.'s needs. Counsel concluded that granting the petition would merely be "unnecessarily delaying the child's permanence," and asked the court to deny it. DCFS's counsel agreed that the time to appeal the court's denial of reunification services had passed. DCFS's counsel also pointed out the infrequency of Father's communication with D.J., as well as his continued association with Mother despite his claims to the contrary. DCFS's counsel

13

concluded that while Father's circumstances might be "changing," they were not "changed" and that, in any case, it was not in D.J.'s best interests to grant the petition because of D.J.'s special needs and the caregiver's ability to meet those needs.

The court denied Father's petition. On the issue of whether he should have been denied reunification services under section 361.5(b)(10), the court noted the time to seek review of that decision had long passed, and this was important because the delay that would result from permitting a challenge now would negatively affect D.J. The court discussed the irregularity of Father's visits, and his lack of attention to learning about D.J.'s special needs from the inception of the case to the present. The court acknowledged "positive signs" from Father, but deemed them to be "changing circumstances." In terms of D.J.'s best interests, the court noted that "in this particular case[,] the bond with the caregiver, the needs [of the child] being met [by the caregiver], [and] the lack of engagement with Father in terms of visitation over an extended period of time in this young child's life suggests it would not be in the best interest of the child" to grant the petition.

Father timely appealed the denial of his section 388 petition.

## DISCUSSION

"Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. (§ 388, subd. (a).) 'The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child.'" (*In re J.M.* (2020) 50

14

Cal.App.5th 833, 845.) "In determining whether [a section 388] petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.) "To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) "We normally review the grant or denial of a section 388 petition for an abuse of discretion." (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

### A. *The Court Did Not Abuse Its Discretion in Not Finding Changed Circumstances*

The court found that Father's evidence regarding his participation in programs amounted to "changing circumstances," impliedly finding there were no "changed circumstances." (See *In re Ernesto R.*, *supra*, 230 Cal.App.4th at p. 223 ["To support a section 388 petition, the change in circumstances must be substantial" and " 'changing,' not changed, circumstances" do not constitute "a substantial change of circumstances"].)

Father argues that: (1) "[t]he evidence overwhelmingly and without contradiction demonstrated that appellant had established changed circumstances in his self-created case plan and recovery from drug dependency"; and (2) "Any minor questions that might arguably remain were a result of the DCFS's lack of direct referrals, oversight and monitoring of the case." We address each contention in turn.

15

### 1.  Father's Sobriety

Father argues that "[a]ll indications were that [he] had remained sober from November, 2020, through the date of the 388 hearing on March 15, 2022."  The record belies this claim.  As early as October 2020, Father recognized the need to separate from Mother "to avoid being tempted, falling back into unhealthy relationships . . . and engaging in drug use."  Yet in March 2021, he admitted to DCFS that Mother "comes and goes" from his apartment, and that he saw her regularly.  In a February 2022 interview with D.J.'s caregiver—three weeks before the hearing on Father's section 388 petition—the caregiver stated that half the time Father video called D.J., he would be "with mom and other people."  Additionally, while Father claimed to have completed a substance use disorder program in March 2021, in the same February 2022 interview, D.J.'s caregiver recounted Father's telling D.J. that Mother was "back there on drugs" but Father "ha[d]n't had none in a couple months"—implying that before "a couple months" ago, he had used drugs.  Thus, there was evidence that Father had been using drugs only a few months before the hearing on his petition.

### 2.  DCFS's Purported Inaction Is Irrelevant

Recognizing gaps in the evidence he provided to the court, Father blames DCFS for the missing information, lamenting that DCFS's "disengagement from overseeing services continued after the improvident bypass order through the date of the 388 hearing" and that the missing information was "a result of the DCFS's lack of direct referrals, oversight and monitoring of the case."  But DCFS had no duty to uncover the information that may have supported Father's section 388 petition.  (See *In re*

16

*J.M.*, *supra*, 50 Cal.App.5th at p. 845 [petitioner has burden to demonstrate changed circumstances].)

Furthermore, all parties agree that the time to challenge the bypass order has passed. Even if the court had previously erred in denying reunification services—a finding we do not make—the sole issue before us is the denial of Father's section 388 petition, for which Father had the burden of proof to demonstrate changed circumstances. Father cites no authority holding that his burden lessened if the bypass order was erroneous.

On this record, the juvenile court did not abuse its discretion in finding that Father had not demonstrated changed circumstances.

### B. *The Court Did Not Abuse Its Discretion in Finding It Would Not Be in D.J.'s Best Interests to Grant the Petition*

The court found that granting Father's petition was not in D.J.'s best interest, citing D.J.'s special needs, Father's lack of regular visitation and failure to learn how to address D.J.'s needs, and D.J.'s bond with his caregiver.

Father concedes the court did not abuse its discretion in refusing to return D.J. to his care, but argues that granting him reunification services "would not interfere" with the caregiver's ongoing care for D.J. He contends that giving him services was a "plus-plus outcome for father and son" and that "[e]ach one deserves these services that should have been ordered from the outset." Father further argues that the conflicting evidence regarding the frequency of his visitation did not justify a denial of his petition.

17

While Father contends that offering him reunification services would be a "plus-plus outcome," he fails to explain how D.J. would benefit, other than to assert that both he and D.J. "deserve[]" these services. Father admits that D.J. had bonded with his caregiver—with whom he had lived since he was two weeks old—and was "making significant progress" with her help. He does not deny there was evidence that he rarely visited D.J. and lacked knowledge of how to meet D.J.'s special needs. As both D.J.'s counsel and the juvenile court noted, granting Father reunification services would only serve to delay permanence for D.J. On this record, the juvenile court did not abuse its discretion in finding that granting Father's petition was not in D.J.'s best interests.

For Father to succeed in his section 388 petition, the court was required to find both that he had demonstrated changed circumstances, and that the granting of the petition would be in D.J.'s best interests. Because the court acted within the bounds of reason in finding that neither element was met, the court did not abuse its discretion in denying Father's petition.

## DISPOSITION

The court's order is affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.                WEINGART, J.

18